## HENSON v. TULSA SALES & SERVICE CO. et al.

No. 34977.  Oct. 2, 1951.

*236 P. 2d 249.*

Hilma Patterson and F. L. Walker, Tulsa, for petitioner.

Pierce, Rucker, Mock, Tabor & Duncan, Tulsa, and Mac Q. Williamson, Atty. Gen., for respondents.

DAVISON, J. This is an original proceeding in this court to review an order of the State Industrial Commission denying compensation to the claimant therein, A. J. Henson, for disability allegedly resulting from an accidental injury received on May 11, 1950, in the course of his employment by the respondent, Tulsa Sales & Service Company. The parties will be referred to as they there appeared.

The sole question presented here is of the sufficiency of the evidence to sustain the order of the commission.

The claimant was employed as a steam fitter in the installation and repair of cleaning and pressing and laundry equipment in the places of business of the customers of the respondent. The home office of the respondent was in Tulsa, Oklahoma, but claimant's duties were performed in numerous cities and towns. On the evening of May 11, 1950, claimant was returning to Tulsa from Pampa, Texas, where he had installed a dry cleaning plant. He was driving a pickup truck with a four-wheel tandum trailer fastened on behind it. As he came over a hill on the highway, he saw ahead of him the lights of a highway patrol car indicating to him the scene of a traffic accident. Claimant's testimony as to what then happened is as follows:

"Q. And as you came over the top of the hill, you thought there has been a wreck down below, there was a red light flashing and you applied your brake?  A. No, I didn't apply the brake, I just let up on the gas and started to slow down and that is when the trailer jackknifed and turned over, broke loose from the truck and turned over in the ditch and the truck run back against the trailer, it turned the truck around in the road and backed off in the ditch against the trailer.

"Q. What happened to you whenever the trailer started swaying back and forth and the truck went in the ditch, what happened to you?  A. Well, it threw me around in the truck while it was swaying, but when I got my jolt and was hurt was when the truck backed down against the trailer and made a sudden stop.

"Q. You say you got hurt, just how did you get hurt, Mr. Henson?  A. Well, it knocked me out and my shoulder and my back and back of my head was hurting and I tried to get them to take me to the hospital or something there."

As to his physical condition at the time of the hearing, September 15, 1950, he testified:

"A. Well, my eyes, I have lost the sight in my right eye, and I can't hear anything out of my right ear and I am nervous at times at night that I break

down and get sick. I have called my boss two or three times now two or three o'clock in the morning, I had to have somebody come down there. And my back hurts, at times I can't get down or up with my back.

"Q. Have you returned to work for anybody since May 11, 1950? Have you done any work at all? A. No."

Respondent's defense to the claim was founded upon the theory that any and all disability of the claimant resulted, not from any injury received in the accident of May 11, 1950, but from injuries received in an altercation which claimant had in McAlester, Oklahoma, on April 16, 1950. On cross-examination, claimant testified that at about 8:30 o'clock in the evening of that day he was in a cafe in McAlester; that as he went out on the sidewalk with a man he'd known some six years, the man pushed him and he "overbalanced on the curb and fell off the curb;" that he was taken to the hospital in an ambulance and remained there ten days. His testimony was very uncertain as to whether or not the police sent him to the hospital; as to the name of the cafe; as to the name and location of the cleaning and pressing plant where he was to pick up equipment, and as to other facts surrounding the happening of the accident.

The medical report of the doctor, who treated claimant at the hospital in McAlester after the injury of April 16, reflects that he was given the information that claimant had been drinking in a beer parlor and had got in a fight, was knocked down and struck his head on the curb. X-ray examination revealed a skull fracture and there was a loss of spinal fluid through the right auditory canal. When he left the hospital some ten days later he was making an uneventful recovery, his ear had quit draining, and there were no headaches. He was advised to contact a physician in Tulsa. The doctor at McAlester had not seen or heard of him since.

The medical report of the doctor, who treated and examined claimant at the hospital in Clinton after the injury of May 11th, reflects that at that time claimant was complaining only of his right shoulder and chest. He was discharged the following day because of his insistence that he was feeling fine and had to get back home to get his work done. The physical examination revealed a right facial paralysis which claimant stated he had when he left the hospital in McAlester. There was no evidence of recent injury to the head.

The medical report of a doctor in Tulsa who examined claimant on September 19, 1950, reflects that claimant complained of "loss of vision in the right eye, loss of hearing in the right ear, 'nervous breakdown,' headaches, stiffness and soreness in his back and hips." His condition was described in the report in the following language:

"Physical examination revealed the head and scalp to be normal. The ears and nose were normal to external examination. Hearing was diminished markedly in the right ear to subjective tests. Both tympani appeared normal. There was a paralysis of the upper eyelid. Otherwise the eyes were normal in appearance and the pupils were round and equal. They reacted normally to light and accommodation. Visual acuity was 20/100 in the right eye and 20/40 in the left. There was a complete facial paralysis including the forehead. . . . Steroscopic radiograms of the skull were made in a right lateral position which revealed evidence of a fracture line approximately one and one-half inches in length extending from the right mastoid region upward. There was no depression and this fracture had the appearance of being old since some callous formation was present. . . .

"This man had a right facial paralysis and what appears to be an old fracture in the right side of the skull involving the mastoid area and possibly the auditory foramen. This condition undoubtedly accounts for this man's complaints. It is difficult for me to establish a causal relationship between the accident he describes (of May 11)

and his present disability. It does not seem that the accident which he describes and the events immediately following were severe enough to result in this condition however, the history may not be reliable. There is no doubt that the man has organic pathology."

The medical report of the doctor in Tulsa, who treated claimant after both injuries and after discharge from each hospital, reflects that, on May 8, 1950, he was released to return to work; that on May 13th he was examined and at that time

"He had a low backache and severe pain in the head. There was a definite muscular weakness in the right side of his face, indicating a right facial paralysis. The vision in the right eye was 20/80, and there was almost a complete loss of hearing in the right ear. These complaints not present on May 8th, 1950, when I had released this man to return to work."

The report continues:

"I am of the opinion that this man suffered a basal skull fracture by reason of the accident of April, and that by reason of the automobile accident of May 11, 1950, the original fracture was re-injured resulting in damage to the peripheral, 7th and 8th cranial nerves on the right side and injury to the right optic nerve, just posterior to the optic chiasm."

Based upon this testimony, the trial commissioner found:

"That the claimant herein has recovered from the injury of May 11, 1950, and has sustained no permanent partial disability as a result thereof and his claim for compensation therefor should be denied,"

and compensation was denied. This finding and order was affirmed on appeal to the commission en banc. The instant action has been brought for vacation of that order.

A recent statement by this court of the law applicable to the situation in the instant case was made in the case of Borden Co. v. Trusley, 204 Okla. 253, 228 P. 2d 1018. Therein, it was said,

"Whether a disability is attributable to an injury or other cause is a question of fact to be determined by the State Industrial Commission from the competent evidence adduced. Its determination of this fact will not be disturbed where reasonably supported by medical testimony. Johnson v. Ben Franklin Refining Co. et al., 194 Okla. 347, 151 P. 2d 428; Liberty Glass Co. v. Lemons, 202 Okla. 667, 217 P. 2d 516; Oklahoma Gas & Electric Co. et al. v. Maloney et al., 184 Okla. 465, 88 P. 2d 363."

In another recent case, Cochran v. Maassen Tool & Supply Co., 204 Okla. 60, 226 P. 2d 953, the following language was used:

"The determination of whether there be a causal connection between an injury and business employment as to create disability under the Workmen's Compensation Law, 85 O.S. 1941 §1 et seq., requires an application of a legal test or standard to the facts and in this sense in each case before the commission there is involved a determination of a question of law. But the ascertainment of the facts necessary to apply such legal test or standard involves the determination of a question of fact, and, if there is evidence to sustain the commission, its findings of fact cannot be disturbed."

These rules of law are too firmly established in this jurisdiction to require the citation of more of the many cases wherein they have been applied. The medical testimony in the case at bar, as hereinabove outlined, clearly supports the conclusion reached by the Industrial Commission.

The order is sustained.

HALLEY, V.C.J., and CORN, O'NEAL, and BINGAMAN, JJ., concur. GIBSON, J., concurs in conclusion.